**DAVIS, Director General of Railroads, v. AMERICAN SILK SPINNING CO.**

(Circuit Court of Appeals, Ninth Circuit. September 5, 1922.)

No. 3845.

1. **Principal and agent** ⬅️101(2)—**Marine insurance agent not authorized to bind owner of cargo by new contract with railroad.**

Agent of marine insurance company, who claimed to represent owner of silk cargo and underwriters, could not bind indorsee of bills of lading by contract with railroad which provided that the silk, which was wet and because of fermentation could not be forwarded under the original shipping contract, should be transported by "silk train service" at the rate of $7.50 per 100 pounds, as against $1.75 stipulated in the bills of lading, and required such indorsee to pay for icing, and to provide attendants to wet down the silk while at the dock and en route.

2. **Carriers** ⬅️47(1)—**Chief clerk of carrier not authorized to make new contract for transportation of cargo, which because of wet condition could not be forwarded under original shipping contract.**

Chief clerk in charge of clerical work of railroad at its office at a dock was not authorized to bind railroad by making new contract for transportation of silk cargo, which because of its wet and fermented condition could not be forwarded under the original shipping contract; the words "clerk" or "chief clerk" being suggestive only of clerical functions, and not of discretionary power to make important contracts.

3. **Carriers** ⬅️47(1)—**Carrier not bound by clerk's unauthorized contract, because of his accepting goods and loading same on cars.**

Where new contract for transportation of cargo, which could not be forwarded under original shipping contract because of its wet condition, was void because made by clerk without authority to bind the railroad, the fact that the cargo was accepted and a part of it loaded on the cars

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

did not make railroad bound by such contract, where the acceptance of the shipment and the loading thereof was done by such clerk or under his direction, since, if the clerk was not authorized to bind the railroad by express agreement, he was not authorized to take possession of the goods and load them in the cars.

In Error to the District Court of the United States for the Southern Division of the Western District of Washington; Robert S. Bean, Judge.

Action by the American Silk Spinning Company against James C. Davis, as Director General of Railroads, operating the Chicago, Milwaukee & St. Paul Railway, and Agent, appointed under the Transportation Act of 1920 (41 Stat. 456). Judgment for plaintiff, and defendant brings error. Reversed.

Geo. W. Korte and C. H. Hanford, both of Seattle, Wash., for plaintiff in error.

Ballinger, Battle, Hulbert & Shorts, of Seattle, Wash., and J. M. Richardson Lyeth, of New York City, for defendant in error.

Before MORROW and HUNT, Circuit Judges, and DIETRICH, District Judge.

DIETRICH, District Judge. This is an action at law by the American Silk Spinning Company against the Director General of Railroads, to recover damages for the refusal of his agents to receive and promptly transport from Tacoma, Wash., to Providence, R. I., 867 bales of silk, commercially known as "Canton steam silk waste." Upon written stipulation the issues were submitted to the court without a jury, and defendant, being dissatisfied with the judgment, which was for the plaintiff in the sum of $105,622, has brought the record here upon writ of error.

The silk was a part of a consignment of 1,000 bales, accepted at Hong Kong, China, in June, 1918, by the Osaka Shosen Kaisha Steamship Company on through bills of lading to Providence, R. I., and shipped by it upon the Canada Maru to Tacoma, Wash., to be forwarded from that port over the lines of the Chicago, Milwaukee & St. Paul Railway, and its connecting carriers, to Providence. On July 30th, before reaching Tacoma, the Canada Maru was stranded on the rocks near Cape Flattery, and was so damaged that large quantities of water entered her cargo spaces. She was again floated, and, under tow, arrived at Tacoma on August 10th. Of the 1,000 bales, 133 were found to be undamaged, and were forwarded in due course. The other 867 bales had been saturated with water, and when they were unloaded on the Milwaukee dock they were somewhat discolored, and by reason of fermentation, which was then in progress, were giving off heat and offensive fumes.

Professing to represent the owners and underwriters, one Taylor arrived at Tacoma on August 12th, soon after the ship had begun to discharge, and, apparently recognizing that the railroad company was under no obligation to carry the silk forwarded in its wet and fermenting condition, under the original shipping contract, and being of the opinion that the emergency required exceptional measures, he discussed

the matter with a Mr. Cheney, chief clerk in one of the dock freight offices of the railroad. Expressing his anxiety to have the silk go forward wet, and without unnecessary delay, Taylor inquired of Cheney whether it could be forwarded by "silk train service," to which questions Cheney replied in the affirmative. He also informed Taylor that the charge for such service would be at the rate of $7.50 per 100 pounds, as against $1.75, stipulated in the bills of lading, and that the cost of icing would be approximately $21 per car. To these terms Taylor assented, and, it being regarded as highly important to keep the bales wet down, a man was assigned to that duty. The cars were ordered, and about half the silk was loaded, when Cheney's superiors, learning of the conditions, declined to be bound by the arrangement he had made, and directed that the bales already upon the cars be unloaded. Some discussion ensued, but the upshot was that the railroad agents refused to carry the silk until it should be reconditioned, the reason assigned being that in its wet state it was unfit for transportation, and could not be carried without great inconvenience and a measure of peril, due to the possibility of spontaneous combustion.

Unable to move them from this position, Taylor then inquired whether they would take the silk if frozen, and upon receiving an affirmative reply he arranged to have it frozen by the Pacific Cold Storage Company of Tacoma. Accordingly the silk was put in cars and carried to the plant of that company, and a few bales unloaded, when a dispute seems to have arisen between Taylor's representatives and the cold storage company touching the charges to be made for the service, as a result of which Taylor concluded to abandon the plan of freezing the silk and to prepare it for shipment by drying. Accordingly the cars were switched to the yards of the Pacific Oil Mills in Seattle, where drying was immediately commenced. Whether because of want of attention and skill, or because of unavoidable conditions, the record does not very clearly disclose, but the process proved to be very slow and inefficient, and not until the 30th of the following January was the silk dry enough to go forward in the ordinary course, and on its arrival in the East it was found to have greatly deteriorated, and, being rejected by the plaintiff, it was sent to New York and sold at auction for a comparatively small sum. Generally speaking, the judgment is for what the court found would have been the reasonable net value of the silk, had it been forwarded promptly under the Cheney arrangement, less the net proceeds of such sales.

Much conflicting testimony was introduced upon the question of the precise condition of the silk when it was first discharged at Tacoma, its tendency to heat and generate noxious gases, the likelihood of spontaneous combustion if forwarded in an unfrozen condition in closed cars, the necessity for frequently wetting it down en route to avoid excessive heat and consequent injury to the fiber, the manner in which it was handled at Seattle, and its condition when it ultimately reached Providence; but analysis of conflicting evidence would be inappropriate here, because upon it the findings of the court below are not reviewable.

The salient questions now presented upon this branch of the case may be thus stated: The silk was in such condition when offered to the railroad company at Tacoma that the railroad agents were not bound to accept it under the through bills of lading issued by the steamship company at Hong Kong, or, indeed, to accept it at all until it was reconditioned and made fit for transportation. That it had been saturated with sea water is admitted, and that in such condition, unless kept cool by freezing or frequent applications of water, it would heat and throw off noxious fumes and deteriorate, is not questioned; and it is practically conceded that if, at the outset, the railroad officials had declined to accept the shipment in its wet condition, they would have been within their rights, but it is contended—and such apparently was the view of the court below—that with knowledge of all the conditions, through Cheney, its authorized agent, the railroad agreed in the manner and upon the terms already explained to transport the silk, and having made such an agreement, and pursuant thereto having accepted it for shipment, it became bound to carry out the terms of the agreement.

Undoubtedly this alleged agreement is fundamental to the plaintiff's right to recover, and, under the pleadings, the special findings of the court, and the conclusions of law, together with defendant's exceptions thereto, and the defendant's requests for findings and conclusions and judgment, and his exceptions to the refusal of the court to grant the same, are such that it becomes our duty to consider its nature and validity, within, but not beyond, the range of legal questions and undisputed facts. Societe Nouvelle D'Armament v. Barnaby, 246 Fed. 68, 158 C. C. A. 294.

The understanding was between Taylor and Cheney alone; no other person or agency participated or approved. Under it the service which the carrier would be called upon to render was not ordinary or merely unusual; it was exceptional and extraordinary. The record discloses no precedent.

[1] As to Taylor's agency, there is no suggestion that he represented the consignor. The bills of lading had been indorsed to the plaintiff on August 7th, and accordingly it contends, and we think correctly, that from that time forward it was the real party in interest. Its place of business was at Providence, R. I., and so far as appears it had no western agency. Its president was called as a witness, but gave no intimation of any authorization of Taylor to act for it. Taylor himself testified:

That he was the general agent of the Firemen's Fund Insurance Company, with headquarters at Seattle; that this company did a marine insurance business; that touching the cargo in question he represented the Board of Underwriters of New York. "Q. Were you (question by counsel for plaintiff) requested by the Board of Underwriters of New York to represent the Underwriters and the owners of the silk? A. I was requested by the Atlantic Mutual Insurance Company, who are members of the Board of Underwriters of New York, to do that."

No other evidence, direct or indirect, was offered upon the subject, and no attempt was made to show authority in the Atlantic Mutual Insurance Company to empower Taylor to act as the plaintiff's represen-

tative. Suppose the silk train had gone forward under the arrangement made by Cheney; could it be seriously contended that upon such a showing the defendant here could have enforced the alleged agreement against the plaintiff, and compelled payment of the additional freight and other charges, upon the theory that Taylor was its authorized agent? Clearly not; but, if not, the agreement would be void for want of mutuality.

[2] Passing, now, to Cheney's authority to bind the defendant: Taylor found him in the offices on one of the docks, apparently in the defendant's employ. That is the extent of the plaintiff's evidence upon the point. By testimony for the defendant it was shown that at the head of the railroad freight department at Tacoma was one Fred J. Alleman, who was the freight agent; that he had an assistant; that the uptown or principal office was in the city, and approximately three miles away were the docks, of which there were three. At each of these docks there was an office, with a clerical force, at the head of which was a chief clerk. At each dock there was also a "foreman," with an assistant, and "the necessary labor to carry on the work." Alleman and his assistant spent part of their time at the city office and part at the docks. Cheney was the chief clerk at the dock where the Canada Maru discharged, and "he was in charge of the office at the clerical end, with clerks under him, and had general supervision of the office." The office was approximately 1,000 feet from the place where the Canada Maru was docked. The defendant had through billing and freight arrangements with the Osaka Shosen Kaisha Company, and in order to make provisions for forwarding the cargo and settling accounts with the steamship company a copy of the manifest of the Canada Maru came to and was kept in Cheney's office. No written requisition was required for cars upon which to load a forward-going cargo, and generally they were ordered by the foreman.

Upon this evidence—and there was none other—is it possible to say that Cheney had the authority to make the alleged agreement? There is no implication of such authority in the position of "clerk," or "chief clerk." These terms are suggestive only of clerical functions, and not of discretionary power to make important contracts. Plaintiff has cited numerous cases in which the authority of a local "station agent" has been considered. In some of these cases it is shown, and as a matter of common information we know that within a certain range a station agent exercises authority to make contracts. The carrier expects to, and gives out that it will, transact business of a certain character at a certain point, and an important part of its business at stations is to contract for the carriage of passengers and freight. In charge of this branch of its business it puts a "station agent." Through him, and him alone, it acts, and within the range of its ordinary business he is held out as its general agent, with the requisite authority to represent it and execute contracts in its name and upon its behalf. But there is no showing here that Cheney exercised, or was held out to the public as having, the authority of an agent. He was neither "agent" nor "assistant agent," but a "clerk" in one of the offices of the "agent." Alleman was the agent, and had an assistant.

It is not intended to say that Cheney's functions were all necessarily clerical in a strict or narrow sense. As chief clerk it may be inferred his duties were in a measure supervisory and extended beyond the mere making of entries in books or the preparation of papers and reports. He may, therefore, well have shared in the responsibility incident to the routine of forwarding shipments delivered at the docks under through bills of lading, and, had the silk been received in good condition, it is fair to assume that it would have been within his province to see that his subordinates took the steps requisite to its going forward in due course in compliance with the calls of the shipping contracts. But it is one thing to bear the responsibility for carrying out a contract for his principal, and quite another to be clothed with authority to make such a contract, especially if it is of an extraordinary character.

Possibly it was out of appreciation of the strain at this point that plaintiff pleaded Cheney's agreement only incidentally or casually. But, however, studiously we may endeavor to put the original contracts in the foreground, the fact remains that the action is not predicated upon a breach of these contracts, but of the Cheney agreement; for, as already noted, not only was the defendant without obligation to carry the silk forward in its wet condition under the original bills of lading, but plaintiff did not desire that it be so forwarded. In the time required for the service covered by the through contracts, the silk, if carried on ordinary freight cars, would have been greatly damaged.

[3] It is suggested that the defendant is bound, regardless of Cheney's want of authority, because it accepted the silk and loaded part of it upon the cars. But that is to beg the question. All that was done in the name of the defendant was in fact done by Cheney or under his direction; and if he was without authority to bind defendant by express agreement, he was also without authority to bind him by taking possession of the silk and loading it in the cars. There are no elements of estoppel; as soon as Cheney's superiors learned of his plans, they repudiated them.

As bearing upon both the question of Cheney's authority and the further defense that the alleged agreement was in contravention of law and the regulations of the Interstate Commerce Commission, perhaps more extended explanation should be made of its terms and the conditions under which it was made. It is first to be understood that, under the published tariffs in force at the time, silk could be carried from Pacific ports to the Atlantic seaboard either by ordinary freight train service, requiring about 30 days for delivery, or by "silk train service," requiring about 6 days. For this fast service a rate of $7.50 per 100 pounds was charged, which was very greatly in excess of the rate for ordinary service. By resorting to the fast service the shipper could shorten the period of his investment, necessarily heavy in such a commodity, and it was for this reason, as we understand, that the special service was established. The service was rendered in one of two ways: A silk car was attached to a passenger train, and was thus carried forward to destination, or, if the shipment was of sufficient magnitude, a special train was provided. In either case the silk was carried in sealed refrigerator cars; but icing was not required. The minimum special train consisted of 7 cars.

Bearing these general conditions in mind, we may consider what was contemplated under the Taylor-Cheney arrangement. If the silk had been dry, it could have been gotten into 4 refrigerator cars; but, being wet, Taylor desired to provide against excessive heat, in so far as was possible, and hence, by the use of wood cleats or stringers and other means, the bales were to be so loaded in the cars that they would be out of close contact with each other, and could be wet down from time to time, and the air would freely circulate about them. For such provisions 5 cars were required, instead of 4. The only evidence of what the agreement was is to be found in Taylor's testimony, and the plaintiff's construction or version of the understanding as disclosed in its computation of damages. From these sources it appears that upon its part the plaintiff was to pay, on the basis of dry weight, the regular tariff rate for "silk train service," and was also to pay for icing the estimated charge of $21 per car. Apparently, too, the plaintiff was at its own expense to provide attendants to wet down the silk from time to time as there was need, while it was at the dock and en route. If we assume that the $21 per car would be a fair charge for icing (there seems to have been no published tariff covering the precise service), the defendant would, under the arrangement, receive what he would have been entitled, and what it would have been his duty, to charge, for transporting the silk had it been dry and otherwise properly conditioned.

Admittedly it would cost him more to load the silk in the special manner contemplated, he would be under the necessity of using 5 cars, instead of 4, there would be the additional weight of the moisture and lumber, and he would have to make provision for carrying the attendants and supplying them with facilities for wetting down the silk, and the process of wetting down would almost necessarily entail substantial delays. For the additional car, the additional weight, and the additional service, the plaintiff was to pay, and the defendant was to receive, nothing. The amount to be paid was simply what, under the published tariffs, the defendant would have been entitled to charge for transporting that quantity of dry silk, in 4 cars, by silk train service. Having in mind the fundamental principle, requiring of carriers uniformity and equality of treatment for all shippers, and the fact that there was no published tariff covering this service, it may be doubted whether such an agreement would have been valid, if made by the agent himself. Atchison & C. Ry. Co. v. Robinson, 233 U. S. 173, 34 Sup. Ct. 556, 58 L. Ed. 901; Southern Ry. Co. v. Prescott, 240 U. S. 632, 36 Sup. Ct. 469, 60 L. Ed. 836; Chicago & Alton R. R. Co. v. Kirby, 225 U. S. 165, 32 Sup. Ct. 648, 56 L. Ed. 1033, Ann. Cas. 1914A, 501. But, without deciding that question, we have no hesitation in holding that an unauthorized clerk in the agent's office was without the requisite power.

In view of this conclusion, we do not deem it necessary to consider the defendant's contention that the regulations of the Interstate Commerce Commission positively prohibited the shipment of the silk in a wet condition, nor need we enlarge upon the significance of the further fact that the quantity of silk was insufficient to make a silk train, and that, if fast service was to be provided, it would be necessary to attach the cars to passenger trains. When it is remembered that the silk

was giving off offensive fumes, and that it would be necessary to wet it down from time to time en route, it at once becomes apparent that the consideration is not without substance.

The judgment is reversed, with costs to plaintiff in error.